## UNITED STATES v. CANDLER.

### (District Court, W. D. North Carolina. November 14, 1894.)

1. LARCENY—EVIDENCE—IDENTIFICATION OF MONEY IN POSSESSION OF ACCUSED.
   Coin or bank notes found in the possession of a defendant soon after a larceny has been committed must be clearly identified as the property stolen, in order to give rise to a legal presumption of guilt; mere general resemblance in kind and amount is only a fact which the jury may consider, in connection with other proved facts, as some evidence of guilt. State v. James, 72 N. C. 482; State v. Freeman, 89 N. C. 469.

2. CRIMINAL LAW—CIRCUMSTANTIAL EVIDENCE.
   In a case founded entirely upon circumstantial evidence, the jury must consider all the independent coincident facts and circumstances shown in

evidence, and find that they are consistent with each other, and point to the guilt of defendant beyond a reasonable doubt, before a verdict of guilty can be properly rendered. U. S. v. Searcey, 26 Fed. 435.

**3. SAME—TESTIMONY OF UNIMPEACHED WITNESS.**

A jury may well consider the improbability of positive statements made by an unimpeached witness, when there are facts and circumstances in evidence tending to lessen the probability that such testimony is true. Quock Ting v. U. S., 11 Sup. Ct. 733, 851, 140 U. S. 417.

**4. SAME — CONDUCT OF ·TRIAL — COMMENT BY PROSECUTION ON DEFENDANT'S FAILURE TO CALL WITNESS.**

When the prosecution relies upon facts and circumstances as making out a prima facie case of guilt, the district attorney may properly comment upon the fact that defendant had a witness present in court who was not introduced, if it appears in evidence that such witness had probable knowledge of the truth or falsity of the facts and circumstances relied upon to make out such prima facie case. Graves v. U. S., 14 Sup. Ct. 40, 150 U. S. 118; Goodman v. Sapp, 9 S. E. 483, 102 N. C. 477.

(Syllabus by the Court.)

Indictment for breaking and entering a post office, and committing a larceny therein.

R. B. Glenn, Dist. Atty., and D. A. Covington, Asst. Dist Atty., for the United States.

V. S. Lusk, S. J. Pemberton, and J. M. Gudger, for defendant.

DICK, District Judge (charging jury). This trial has evidently excited much public interest. The evidence and the circumstances attending the trial are well calculated to give rise to such public interest. The defendant is a boy 15 years of age, and he was attended during the trial by his father, mother, sister, and other relatives, who are persons of high character in the community. The case has been well and ably managed by counsel on both sides, in the examination of the witnesses, and in their arguments before you,—and it is one that requires your careful and impartial consideration. That entry was made into the post office at the time stated, and that money and stamps were taken therefrom, are facts which are not controverted. The evidence shows only two ways by which entry into the post office could have been made,—by a key, or by the transom above the back door of the building. Miss Sherrill, the postmistress, and her brother who acted as her assistant, were the only persons who had possession of the key. She testified that on the evening before the night when the post office was robbed she examined her money drawer, and found that she had a $10 gold coin, a $5 bank bill, and some change in silver and coppers, amounting in all to about $25. She also had a number of 10-cent and 2-cent postage stamps. At 6 o'clock in the evening she locked the door, and carried the key to her home, and placed it in a trunk in her mother's room. On the next morning her brother went to the post office, and soon came back, and informed her that the office had been robbed. She found the drawer out on the floor, with lock broken, and her money gone, and some of the 10-cent stamps. On the inside of the room a chair had been placed close to the door. On the outside an old window shutter was leaning against the door, which had marks of dirt made by footsteps. The three panes of glass had been

taken from the transom, and placed above unbroken. The size of the panes of glass was about 10 or 12 inches. The door was about 3 feet wide, and she thought that the defendant could have easily passed through the transom. She saw the defendant that night at church about 9 o'clock, and he went home with her brother, and remained all night, and went off the next morning before she could see him. The defendant had never stayed at her mother's house before that time. Her testimony was substantially sustained by the testimony of her brother. He further said that defendant, on the morning after the robbery, went with him on his way to the post office, but turned aside to go to an unfinished church building close by. He also said that at the back door of the post office he found several tracks made by a No. 6 shoe, and he placed his own foot in the track, and there was a good fit. He also gave his opinion as to the size of the transom, and thought that defendant could have passed through. There is no evidence, ascertained by actual measurement, as to the exact size of the transom, and no experiment was made to find whether a 15-year old boy could have passed through the opening.

As this indictment is founded entirely upon circumstantial evidence, you should consider every attendant circumstance calculated to throw light upon the subject of investigation, and determine whether the independent coincident facts and circumstances shown in evidence are consistent with each other, and point to guilt of defendant beyond a reasonable doubt.

Had the defendant any knowledge of things in the post office? I remember no direct and specific evidence upon that point. As to the tracks on the outside, there is no direct evidence tending to show that defendant made them. His foot was not measured, and the evidence clearly shows that he usually wore No. 7 shoes. The evidence shows that on the day after the robbery the defendant was arrested at Murphy, and on search he was found in possession of a $10 gold piece and some silver change and coppers, amounting to about $25, but no $5 bank bill or stamps. If any of the coin had been marked so that it could have been strictly identified as the property stolen, such fact would have given rise to a strong presumption of guilt. As the coin found upon his person was like the ordinary circulating currency of the country, incapable of strict identity, no presumption of law arises, but the fact is a circumstance which may be considered in connection with other circumstances as evidence of guilt. The entry was made on the night of 2d April, while religious services were being conducted at a church close by, and in full view of the back door of the post office, and there was a large crowd inside and outside of the church. There is evidence that defendant was at the church, and talked with Henry Connor at the door, and asked him to go down town with him. Another witness testified that defendant came partly into the door of the church, looked around, and went out, and was absent half an hour, and then returned, and remained until the services were ended. It was insisted by counsel for defense that the entry could not have been made at that time, for the light which the evidence shows was used by the

robber would have been clearly visible to the large crowd attending the church. Upon this point you may consider whether a light seen in the post office at that early hour in the night would have been calculated to excite any surprise in the persons seeing it.

It is further insisted by counsel for defendant that, if defendant was the robber, he would not have gone to the home of the postmistress with her brother, and remained all night with the money on his person. The evidence shows that on the next morning the defendant left young Sherrill, and went into the unfinished church, and he assigned no reason for so doing, and such a circumstance might excite a conjecture that he went there to get the money which he had concealed the previous night. I will now call your attention to the testimony of Henry Connor. He testified before the commissioner, on the preliminary investigation, that on the morning after the robbery defendant came to his house, and asked him for the loan of a tobacco poke to put his money in. That he had some money tied up in a handkerchief, and the bulk was about the size of an inkstand, and he told witness that he had borrowed the money. On his examination before you he testified to another material fact, which he did not state before the commissioner,—although the prosecution was conducted by an earnest and skillful lawyer. He now says that on Sunday evening, the day before the robbery was committed, the defendant told him that he (defendant) intended to break into the post office to get money. You may well consider the probability of such a story, after being so long withheld from disclosure. Is it probable that, without any motive, the defendant would have told of his intention to commit a robbery, when he knew that his plan could so easily be frustrated by the witness making disclosure? If he had asked witness to participate in the robbery, then there would be some show of probability; but no such request is shown in evidence. There is certainly some improbability of the truth of the statement shown by the circumstances that witness did not remember so important a fact three days after the occurrence, when he was examined before the commissioner, and the citizens of the community and the officers of the law were so eager and desirous of finding the guilty offender.

I will now call your attention to the testimony of Joseph Connor. He was not a witness before the commissioner at Dillsboro, although he lived close by, and was present at the preliminary trial. More than two months after such trial Deputy Marshal Sherrill carried Joseph Connor before Commissioner Davies, when and where he made an affidavit, in which he stated that on the morning after the robbery defendant came to his sawmill, about a mile from Dillsboro, and showed him some money tied up in a handkerchief, and showed an envelope which, he said, contained postage stamps. He asked defendant where he got the money. After some dispute, defendant said to witness, "I snaked it last night." When this affidavit was made the deputy marshal told witness to keep the matter a secret. It is also in evidence that about the time the affidavit was made witness told Mr. Dills that he knew nothing against defendant as to Dillsboro post office robbery. As the commissioner had heard the

matter, and bound over the defendant to the district court, his juris-diction had ceased, and the affidavit was extrajudicial, and is not admissible in evidence as a valid affidavit; but it may be used as a declaration of witness, for the purpose of supporting his testimony given on this trial. The secrecy observed by witness at the request of the deputy marshal who carried him before the commissioner, to-gether with his declaration to witness Dills just after affidavit was made, that he knew nothing against defendant, is calculated to excite some suspicion as to the propriety of the motives of witness. You may also consider the probability of his statement that on the morning after the robbery the defendant voluntarily, and without any motive, showed him money and stamps, and told him, "He snaked it last night"; and that witness, although he knew of the arrest of defendant for the robbery committed on the previous night, did not disclose so material a fact on the preliminary trial. You may well consider the improbability of positive statements made by an unim-peached witness when there are facts and circumstances in evidence tending to lessen the probability that such testimony is true.

There is another fact relied upon by the prosecution as tending to show an evil mind and purpose on the part of the defendant. The railway agent at Dillsboro testified that a day or two before the post office was robbed the defendant came into his office, and inquired "if a man could ride on the railway cars with a stolen ticket," and also asked him where and how he kept the money of his office. You may well consider what were the motives of defendant in making such inquiries. Was it his purpose to steal from such office, and from the person of whom he made the inquiries? or were the questions prompted by the idle curiosity of a boy who could see the open manner in which tickets were kept, and who also saw the agent frequently receiving money?

On the day after the robbery the defendant was arrested at Murphy by the town marshal, under the authority of a telegram from his father. The defendant was searched, and on his person were found a $10 gold piece and some silver change and coppers in a tobacco poke, amounting to about $25, but no $5 bank bill or stamps were obtained. Defendant said he had found money tied up in a handkerchief near post office. It is material for you to inquire the reason that induced defendant to leave Dillsboro on the day after the robbery. If his conduct was induced by fear of an arrest, then it was a "flight" from justice, and is strong presumptive evidence of guilt. If his going to Murphy was the carrying out of a long pre-determined purpose to visit his brother in Atlanta, and the execution of this purpose was hastened by the fight with his sister on the previous day, and the severe blow which he received from his mother, then his journey was not a flight, and furnishes no presumption of guilt.

The evidence further shows that when defendant was in custody, and was on his return to Dillsboro, he told the deputy marshal that he found the money that he had on his person when arrested by the town marshal at Murphy. The fact that defendant had on his per-son on the day after the robbery, money resembling that which had

been stolen from the post office, is a very material circumstance indicating guilt, calling for some probable and reasonable explanation on his part. He has endeavored to furnish such explanation by the testimony of his mother and sister. His mother testified that her son, the defendant, had been in Asheville with his brother for several months, and returned home in February, a day or two after the death of her little daughter. She soon after saw the defendant with a $10 gold piece, and some silver change, in all about $25, which he told her he had obtained in Asheville. He kept his money hidden in the barn, and asked her not to tell his father, as he would not let him go to Atlanta to visit his brother. She also stated that on the evening before the robbery defendant got into a fight with his sister, and had pulled her by the hair, when she (mother) struck him a severe blow on the head with a shoe, which produced considerable bleeding; and he left home in a very angry mood, and did not return until late next morning, when he requested her to prepare his clothes, as he was going to Atlanta that day. She prepared his clothes; examined those that were taken off, and saw considerable blood upon them. Defendant then went off to take the railway cars to Murphy, on his way to Atlanta. The sister, in her examination as a witness, confirmed the testimony of her mother in all respects, and further testified that at morning and evening, every day for three weeks, in March, her brother, the defendant, went with her to the barn when she milked the cows; that he went into the barn every time, and counted his money, and sometimes added some silver change or coppers; and she saw the money in the barn a few days before the robbery of the post office. The money in the possession of defendant, as shown by the mother and sister, has a more exact similitude to the money found on his person in Murphy than that of the articles stolen from post office, which consisted of a gold coin, bank bill, silver change, coppers, and stamps. If you believe the testimony of the mother and sister as to his previous possession of the money by them described, then a very strong circumstance tending to show guilt has been reasonably accounted for. The tracks at the back door of post office do not point to defendant as the robber, as the size did not correspond with shoes of defendant. The tobacco poke containing the money on his person when arrested at Murphy was not shown to be the identical poke given him by the witness Henry Connor. The strongest uncontradicted testimony tending to show guilt is that of the Connor boys, which I have already sufficiently called to your attention. There is evidence tending to show that there was a very active prosecution on the part of the friends of Miss Sherrill, the postmistress, and that some of the very material circumstances relied upon were not disclosed until this trial began. Counsel for prosecution commented on the fact that Dr. Candler, the father of defendant, was in court during the trial, and was not offered as witness to explain proved circumstances which indicated the guilt of defendant. If it had been shown in evidence that Dr. Candler probably had knowledge of the truth or falsity of the circumstances relied upon by the prosecution as making a prima facie case of guilt, then his failure to testify might properly be commented on as some

evidence to strengthen such prima facie case. But the evidence tends to show that Dr. Candler had no knowledge about such circumstances, or the purposes of defendant, as he was kept in the dark on the subject at the request of defendant. The fact that he sent the telegram that caused the arrest of his son at Murphy tends to show that he had no knowledge that his son had money, and intended to go to Atlanta. It is obligatory upon the prosecution to prove, beyond a reasonable doubt, the guilt of defendant before a verdict of guilty can be rendered by you. If the evidence fully satisfies you of such guilt, then you should so return your verdict, and leave matters of mercy and sympathy to the court. If, however, the evidence does not satisfy you, beyond a reasonable doubt, as to the guilt of defendant, then you should return a verdict of not guilty.